## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Mark Morin, Janet Hufnagel, Diane Mesedahl, Shannon Lushine, Amy Palo, Tim Robinson, and Jeanette Terhaar, individually and as representatives of a class of similarly situated persons, and on behalf of the Essentia Health Retirement Plan and the Essentia Health 403(b) Plan, | Civil No. _____ |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| Essentia Health, St. Mary's Duluth Clinic Health System, the Essentia Health Investment Committee, Diane T. Davidson, and John Does 1-30, | |
| Defendants. | |

## <u>INTRODUCTION</u>

1.  Plaintiffs, on behalf of all similarly situated participants and beneficiaries of the Essentia Health Retirement Plan ("Retirement Plan") and the Essentia Health 403(b) Plan ("403(b) Plan") (together, the "Plans"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against the Plans' fiduciaries to recover financial losses suffered by the Plans and to obtain injunctive and other equitable relief for the Plans as provided by ERISA.

2. Defendants breached their fiduciary duties under ERISA by causing the Plans to pay excessive fees and failing to monitor and control the Plans' escalating costs, resulting in millions of dollars of losses to the Plans.

## JURISDICTION AND VENUE

3. This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

4. This district is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plans are administered, where the alleged breaches took place, and where Defendants do business and may be found.

## PARTIES

### *Plaintiffs*

5. Mr. Morin lives in Eveleth, Minnesota. He worked at Essentia Health for 9 years as a maintenance supervisor and facilities manager and was a participant in the Retirement Plan until August 2015. Morin's account balance at the time he exited from the Retirement Plan would have been higher if not for Defendants' imprudent and disloyal management of the Retirement Plan.

6. Ms. Hufnagel lives in Grand Rapids, Minnesota. She worked at Essentia Health for nearly 12 years as a CNA and was a participant in the Retirement Plan until July 2015. Ms. Hufnagel's account balance at the time she exited the Retirement Plan would have

been higher if not for Defendants' imprudent and disloyal management of the Retirement Plan.

7. Ms. Mesedahl lives in Duluth, Minnesota. She worked at Essentia Health for nearly 4 years in Environmental Services and was a participant in the Retirement Plan until June 2015 and the 403(b) Plan until July 2014. Ms. Mesedahl's account balances in the Retirement Plan and the 403(b) Plan would have been higher at the time she exited the Plans if not for Defendants' imprudent and disloyal management of the Plans.

8. Ms. Lushine lives in Iron, Minnesota. She worked at Essentia Health for nearly 25 years as a Patient Financial Counselor and is a current participant in the Plans. Ms. Lushine's account balances would be higher if not for Defendants' imprudent and disloyal management of the Plans.

9. Ms. Palo lives in Embarrass, Minnesota. She worked at Essentia Health for nearly 12 years as a Patient Services Assistant and was a participant in the 403(b) Plan until December 2011 and the Retirement Plan until February 2014. Ms. Palo's account balances in the Retirement Plan and the 403(b) Plan would have been higher at the time she exited the Plans if not for Defendants' imprudent and disloyal management of the Plans.

10. Mr. Robinson lives in Duluth, Minnesota. He worked at Essentia Health for nearly 9 years as a Medical Social Worker and is a current participant in the Plans. Mr. Robinson's account balances would be higher if not for Defendants' imprudent and disloyal management of the Plans.

11. Ms. Terhaar lives in Cohasset, Minnesota. She worked at Essentia Health for nearly 30 years as a Registered Nursing Assistant and was a participant in the Retirement Plan until about June 2016.  Ms. Terhaar's account balance at the time she exited the Retirement Plan would have been higher if not for Defendants' imprudent and disloyal management of the Retirement Plan.

### Defendants

12. Essentia Health ("Essentia") is a Minnesota nonprofit corporation that owns and operates medical clinics, hospitals, fitness and therapy centers, medical rehabilitation centers, long-term care facilities, pharmacies, and assisted/independent living centers throughout Minnesota, North Dakota, Wisconsin, and Idaho.  Essentia sponsors the Plans for its employees and the employees of subsidiary health services providers operating under its control.  The Plans' participants are nurses, technicians, caregivers, support staff, and administrators who rely on the Plans for their retirement savings.  The Plans' governing documents identify Essentia as the fiduciary of the Plans responsible for overall administration of the Plans.  Essentia's responsibilities include hiring service providers, monitoring their performance, and maintaining the Plans' investment portfolio.  Through its Board of Directors, Essentia appoints, and has authority to remove, members of the Essentia Health Investment Committee and individual administrators of the Plans.  As part of its oversight of these fiduciaries, Essentia receives, and is responsible for reviewing, periodic reports concerning the Plans.  By virtue of its various powers and duties, Essentia has discretionary control over the administration of the Plans and the

disposition of the Plans' assets.  Essentia is the sponsor of the Plans as provided by 29 U.S.C. §1002(16)(B), the administrator of the Plans under 29 U.S.C. §1002(16)(A), a named fiduciary of the Plans under 29 U.S.C. § 1102(a)(2), and a functional fiduciary of the Plans under 29 U.S.C. § 1002(21)(A)(i),(iii).  For its breaches of its fiduciary duties alleged herein, Essentia is subject to liability under 29 U.S.C. §§ 1109 and 1132(a).

13. St. Mary's Duluth Clinic Health System ("SMDC") is a Minnesota nonprofit corporation and a subsidiary of Essentia.  Prior to January 2012, the Retirement Plan's governing document identified SMDC as the sponsor and fiduciary of the Retirement Plan responsible for overall administration of the Retirement Plan.   Through its Board of Directors, SMDC had the authority to amend the Retirement Plan, hire outside service providers, and appoint individual administrators.  By virtue of its various powers and duties, SMDC had discretionary control over the administration of the Plans and the disposition of the Plans' assets.  SMDC was the sponsor of the Plans as provided by 29 U.S.C. §1002(16)(B), the administrator of the Plans under 29 U.S.C. §1002(16)(A), a named fiduciary of the Plans under 29 U.S.C. § 1102(a)(2), and a functional fiduciary of the Plans under 29 U.S.C. § 1002(21)(A)(i),(iii).  For its breaches of its fiduciary duties alleged herein, SMDC is subject to liability under 29 U.S.C. §§ 1109 and 1132(a).

14. The Essentia Health Investment Committee (the "Investment Committee") is a committee appointed by Essentia and is responsible for oversight of the Plans, including the Plans' expenses.  .  The Investment Committee's constituent members are employees of Essentia who serve at the direction of Essentia.  The Investment Committee reports to

Essentia's Board of Directors.  The Investment Committee is a fiduciary of the Plans pursuant to 29 U.S.C. § 1002(21)(A)(i) because it exercises discretionary control respecting the disposition of the Plans' assets.  The identities of the individual members of the Investment Committee are not known to Plaintiffs as of the commencement of this lawsuit.  Individual members of the Investment Committee are named herein as Defendants John Does 1–15.  Defendants John Does 1–15, as members of the Investment Committee, are fiduciaries of the Plans pursuant to 29 U.S.C. § 1002(21)(A)(i).  For their breaches of their fiduciary duties alleged herein, the Investment Committee and John Does 1–15 are subject to liability under 29 U.S.C. §§ 1109 and 1132(a).

15. Diane T. Davidson ("Davidson") is a natural person and an employee of Essentia. Davidson has held various titles consistent with serving as a chief executive in Essentia's human resources department.  Under the Retirement Plan, as it was constituted prior to January 2012, Davidson was the plan administrator because the Retirement Plan's governing document provided that the Senior Vice President of Human Resources of SMDC would serve as plan administrator.  During this time, the Retirement Plan's summary description provided to participants identified Davidson as the Senior Vice President of Human Resources and the administrator the Retirement Plan.  Since January 2012, although the Retirement Plan was amended and restated and no longer identifies Davidson's office as the plan administrator, Davidson has served functionally as the individual administrator of both Plans, with the authority to carry out the duties assigned to Essentia by the Plans' governing documents.  Davidson has served at all times with

the consent of and at the direction of Essentia.  Davidson's authority has at all times included the hiring and monitoring of service providers for the Plans.  Based on her authority, Davidson had discretionary control over the administration of the Plans and the disposition of the Plans' assets.  Davidson was a named fiduciary of the Retirement Plan under 29 U.S.C. § 1102(a)(2) and is a fiduciary of the Plans pursuant to 29 U.S.C. § 1002(21)(A)(i),(iii).  For her breaches of her fiduciary duties alleged herein, Davidson is subject to liability under 29 U.S.C. §§ 1109 and 1132(a).

16. Essentia, SMDC, the Investment Committee, Davidson, and John Does 1–15 maintained the power to delegate their fiduciary responsibilities with respect to the Plans to other committees, entities, and individuals.  The identities of such delegate committees, entities, and individuals are not known to Plaintiffs as of the commencement of this lawsuit.  The delegates are named herein as Defendants John Does 16–30.  During the relevant time, John Does 16–30 were delegated fiduciary responsibilities by the Plans' fiduciaries, including discretionary authority to administer the Plans and their assets, hire and review the performance of service providers, and select and oversee investment options available under the Plans.  By virtue of John Does 16–30's various powers and duties, John Does 16–30 are also fiduciaries pursuant to 29 U.S.C. §§ 1002(21)(A) and 1105(c)(2).  For their breaches of their fiduciary duties, John Does 16–30 are subject to liability under 29 U.S.C. §§ 1109 and 1132(a).

### *The Plans*

17. The Retirement Plan was established and effective on December 22, 1965. It has been restated and amended numerous times since. It was recently restated and amended, effective January 1, 2012, to identify Essentia as the sponsor and replace Essentia's subsidiary, SMDC.[1] The 403(b) Plan was first established and effective on January 1, 2009. Essentia has been identified as the 403(b) Plan sponsor since its inception.

18. The Plans are "employee pension benefit plan[s]" under 29 U.S.C. §1002(2)(A) and "individual account plan[s]" or "defined contribution plan[s]" under 29 U.S.C. §1002(34).

19. Employees may invest their earnings on a pre-tax basis toward retirement by making contributions to the Plans, subject to annual contribution limits determined by the Internal Revenue Service (IRS). All contributions are held in trust and invested in one or more designated investment alternatives available under the Plans. Defendants are responsible for selecting and overseeing the Plans' designated investment alternatives.

20. Participants in a defined-contribution plan are limited in their investment choices to a lineup of options offered by their plan. *See* Investment Company Institute, A Close Look at 401(k) Plans, at 9 (Dec. 2015), *available at*

---

[1] Because SMDC was at all relevant times a subsidiary of Essentia, and because each entity had the same fiduciary responsibilities as sponsor and administrator of the Retirement Plan (SMDC until January 2012, Essentia from January 2012 to present), Plaintiffs will use "Essentia" throughout the remainder of the Complaint to include both SMDC and Essentia, unless noted otherwise.

https://www.ici.org/pdf/ppr_15_dcplan_profile_401k.pdf (hereinafter "ICI Study"). Because Defendants determine the investment options available, the investment lineup maintained by Defendants is critical to the retirement benefits participants receive.

21. The Plans must bear all administrative expenses not paid by Essentia. Defendants are responsible for hiring outside service providers to hold the assets of the Plans, execute investments, maintain records, provide account statements, and perform other services as necessary to administer the Plans. Defendants are thus responsible for determining and monitoring the compensation paid for these services from the Plans' assets. Because Defendants choose the Plans' service providers and approve their compensation from the Plans, Defendants' conduct in obtaining administrative services for the Plans is critical to the retirement benefits participants receive.

22. The Retirement Plan had 16,848 participants with balances and held approximately $982 million in assets at the end of 2014. The 403(b) Plan had 2,836 participants with balances and held approximately $103 million in assets. The Plans combined administratively in 2012, contemporaneously with the restatement and amendment of the Retirement Plan. The size of a defined contribution plan, both by number of participants with balances and total assets, determines the pricing a plan can obtain for administrative services and investment management. By combining administratively, the Plans have had the ability to operate in the market as a 20,000-participant plan with $1 billion in assets.

## ERISA FIDUCIARY DUTIES

23.  ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a)(1) states, in relevant part, that:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

    (A)    For the exclusive purpose of

        (i)    Providing benefits to participants and their beneficiaries; and

        (ii)    Defraying reasonable expenses of administering the plan;

    (B)    With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

24. These ERISA fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)).

## DUTY OF LOYALTY

25. The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and

beneficiaries . . . ." Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

26. While ERISA does not prohibit an employer's corporate officers from serving as plan fiduciaries—basically wearing two hats—it does require that the officer "wear the fiduciary hat when making fiduciary decisions." *Pegram*, 530 U.S. at 225. In administering an ERISA plan, corporate officers must "avoid placing themselves in a position where their acts [or interests] as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of the pension plan." *Donovan*, 680 F.2d at 271. "A fiduciary with a conflict of interest must act as if he is 'free' of such a conflict. 'Free' is an absolute. There is no balancing of interests; ERISA commands undivided loyalty to the plan participants." *Bedrick ex rel. Humrickhouse v. Travelers Ins. Co.*, 93 F.3d 149, 154 (4th Cir. 1996).

27. "The presence of conflicting interests imposes on fiduciaries the obligation to take precautions to ensure that their duty of loyalty is not compromised." *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 299 (5th Cir. 2000). "When it is 'possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in intensive and scrupulous independent investigation of their options to insure that they act in the best interests of plan beneficiaries.'" *Howard v. Shay*, 100 F.3d 1484, 1488–89 (9th Cir. 1996) (quoting *Leigh v. Engle*, 727 F.2d 133, 125–26 (7th Cir. 1984)).

## DUTY OF PRUDENCE

28. ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (quotation omitted). Therefore, "a fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds" available within the plan could have "theoretically . . . create[d] a prudent portfolio." *Krueger v. Ameriprise Fin., Inc.*, No. 11-CV-02781, 2012 WL 5873825, at *14 (D. Minn. Nov. 20, 2012) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007)).

29. Failing to closely monitor and subsequently minimize administrative expenses (by, for example, failing to survey the competitive landscape and failing to leverage the plan's size to reduce fees), constitutes a breach of fiduciary duty. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014). Similarly, selecting and retaining higher-cost investments because they benefit a fiduciary or affiliate constitutes a breach of fiduciary duties when similar or identical lower-cost investments are available. *Braden v. Wal-Mart Stores*, 588 F.3d 585, 596 (8th Cir. 2009).

12

## SOURCE AND CONSTRUCTION OF DUTIES

30. The Supreme Court has noted that the legal construction of an ERISA fiduciary's duties is "derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828. Therefore, "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Id.* In fact, the duty of prudence imposed under 29 U.S.C. § 1104(a)(1)(B) is a codification of the common law prudent investor rule found in trust law. *Buccino v. Continental Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983).

31. Pursuant to the prudent investor rule, fiduciaries are required to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." Restatement (Third) of Trusts § 90(c)(3) (2007); *see also* Restatement § 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function.").

32. In considering whether a fiduciary has breached the duties of prudence and loyalty, the Court considers both the "merits of the transaction" as well as "the thoroughness of the investigation into the merits of the transaction." *Howard*, 100 F.3d at 1488 (quotation and citation marks omitted). Mere "subjective good faith" in executing these duties is not a defense: "a pure heart and an empty head are not enough." *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983).

## CO-FIDUCIARY LIABILITY

33. ERISA also imposes explicit co-fiduciary duties on plan fiduciaries. 29 U.S.C. § 1105(a) states, in pertinent part, that:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

    (1)    If he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

    (2)    if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

    (3)    If he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## PRUDENT MANAGEMENT OF AN EMPLOYEE RETIREMENT PLAN

### MINIMIZATION OF PLAN EXPENSES

34. At retirement, employees' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826. Accordingly, excessive fees can significantly impair the value of a participant's account. Over time, even seemingly small differences in fees and performance can result in vast differences in the amount of savings available at retirement. *See, e.g.*, Stacy Schaus, *Defined Contribution Plan Sponsors Ask Retirees, "Why Don't You Stay?" Seven Questions for Plan Sponsors*, PIMCO (Nov. 2013), https://www.pimco.com/insights/investment-strategies/featured-solutions/defined-contribution-plan-sponsors-ask-retireeswhy-dont-you-stay-seven-questions-for-plan-sponsors (explaining that "a reduction in [annual] fees from 100

bps[2] to 50 bps [within a retirement plan] could extend by **several years** the potential of participants' 401(k)s to provide retirement income") (emphasis added); U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 1–2 (Aug. 2013), *available at* http://www.dol.gov/ebsa/pdf/401kFeesEmployee.pdf (illustrating impact of expenses with example in which 1% difference in fees and expenses over 35 years reduces participant's account balance at retirement by 28%).

35. There are two major categories of expenses within a defined contribution plan: administrative expenses and investment management expenses. ICI/Deloitte Study at 17. Investment management expenses are the fees that are charged by the investment manager, and participants "typically pay these asset-based fees as an expense of the investment options in which they invest." *Id.* On average, 82% of overall fees within a plan are investment expenses, while administrative fees on average make up only 18% of total fees. *Id*. Administrative expenses (*e.g.*, recordkeeping, trustee and custodial services, accounting, etc.) can be paid directly by employers, directly by the plan, or indirectly as a built-in component of the fees charged for the investment products offered in the plan in a practice known as "revenue sharing" (or a combination of these three). Ayres & Curtis, *Beyond Diversification* at 1486; ICI/Deloitte Study at 16. Such "revenue sharing" payments from investment managers to plan service providers typically happen

---

[2] The term "bps" is an abbreviation of the phrase "basis points." One basis point is equal to .01%, or 1/100th of a percent. Thus, a fee level of 100 basis points translates into fees of 1% of the amount invested. *See* Investopedia, Definition of 'Basis Point (BPS)', http://www.investopedia.com/terms/b/basispoint.asp (last accessed Sept. 8, 2016).

on a monthly or quarterly basis and are determined by an agreed-upon contribution formula. Though revenue sharing arrangements are not necessarily prohibited transactions under 29 U.S.C. § 1106(b), plan fiduciaries "must act prudently and solely in the interest of plan participants and beneficiaries both in deciding whether to enter into, or continue, [a revenue sharing arrangement] and in determining the investment options in which to invest or make available to plan participants and beneficiaries in self-directed plans." U.S. Dep't of Labor, DOL Advisory Opinion 2003-09A, 2003 WL 21514170, at *6 (June 25, 2003). If revenue sharing is paid to a service provider, a fiduciary must monitor the total compensation received by the service provider and, if excessive, recall the excess for the benefit the plan. *Tussey v. ABB, Inc.*, 2:06-CV-04305-NKL, 2012 WL 1113291, at *10 (W.D. Mo. Mar. 31, 2012) ("[A fiduciary] must use its "purchasing power" to negotiate for rebates from [a service provider], either in the form of basis points or hard-dollar amounts, if the amount of revenue sharing generated exceeded market value for [the service provider's] services."), *aff'd in pertinent part*, 746 F.3d 327 (8th Cir. 2014).

36. Fiduciaries exercising control over administration of the plan and the selection and monitoring of core investment options can minimize plan expenses by hiring low-cost service providers and by curating a menu of low-cost investment options. This task is made significantly easier the larger a plan gets. Economies of scale generally lower administrative expenses on a per-participant or percentage-of-assets basis. ICI/Deloitte Study at 7, 21. Larger plans also can lower investment management fees by selecting

mutual funds only available to institutional investors or by negotiating directly with the investment manager to obtain a lower fee than is offered to mutual fund investors. *See* Consumer Reports, *How to Grow Your Savings: Stop 401(k) Fees from Cheating You Out of Retirement Money* (Aug. 2013), *available at* http://www.consumerreports.org/cro/magazine/2013/09/how-to-grow-your-savings/index.htm (instructing employees of large corporations that "[y]our employer should be able to use its size to negotiate significant discounts with mutual-fund companies"); U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, at 17 (April 13, 1998), *available at* https://www.dol.gov/ebsa/pdf/401kRept.pdf (reporting that by using separate accounts and similar instruments, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds"). Empirical evidence bears this out. In 2013, total plan fees in the average defined contribution plan were 0.89%, but this varied between an average of 1.34% in plans with $1 million to $10 million in assets, and an average of only 0.43% for plans with between $500 million and $1 billion in assets. ICI Study at 47.

37. Given the significant variation in total plan costs attributable to plan size, the reasonableness of administrative expenses and investment management expenses should be determined by comparisons to other similarly-sized plans. *See* 29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to discharge their duties in the manner "that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character") (emphasis added); *Tibble v. Edison Int'l*,

2010 WL 2757153, at \*9, 15, 28 (C.D. Cal. July 8, 2010) (evaluating the propriety of particular fees and investment decisions in light of the size of the plan), *rev'd on other grounds*, 135 S. Ct. 1823 (2015); *Tussey v. ABB, Inc.*, 2007 WL 4289694, at \*6, n.5 (W.D. Mo. Dec. 3, 2007) (determining that administrative and investment expenses were unreasonable through comparisons to similar plans because "[a]t most, reasonable compensation should mean compensation commensurate with that paid by similar plans for similar services to unaffiliated third parties") (quoting Nell Hennessy, *Follow the Money: ERISA Plan Investments in Mutual Funds and Insurance*, 38 J. Marshall L. Rev. 867, 877 (2005)).

## DEFENDANTS FAILED TO MONITOR AND CONTROL COMPENSATION PAID TO THE PLANS' RECORDKEEPERS

38. Recordkeeping is a necessary service for any defined contribution plan. The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

39. The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

40. Plans must implement processes to prudently manage and control a plan's recordkeeping costs. First, they must pay close attention to the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

41. Second, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a responsible fiduciary must identify *all* fees, including (and especially) any discretionary or variable compensation.

42. Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process every three to five years as a matter of course, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.

43. Prior to January 1, 2012, Defendants kept the Plans' records separately.  Defendants used BMO Harris as the recordkeeper for the Retirement Plan and Lincoln National Corporation ("Lincoln") as the recordkeeper for the 403(b) Plan.  The Retirement Plan had 5,009 participants with account balances at the end of its 2009 plan year, and the

403(b) Plan had 2,731 participants.[3]   The size of the Plans stayed roughly the same through the end of 2011.

44. Though the Plans were operated as two separate entities, this should not have diminished their combined bargaining power, as Defendants had control of both Plans.  A prudent fiduciary would have offered service providers the ability to service both Plans as a way to attract their business and ultimately demand lower rates.

45. Based on Plaintiffs' investigation and analysis of the market for recordkeeping services in the 2009 to 2011 timeframe, the Plans should have been able to procure comprehensive recordkeeping services for between $60 and $80 per participant.

46. In 2009, Defendants caused the Retirement Plan to pay BMO Harris a grossly excessive $127 per participant, more than 50% above a reasonable amount.  Moreover, the Retirement Plan's excess was exclusive of revenue sharing.  The Retirement Plan's Form 5500s during these years stated that BMO Harris was receiving additional indirect compensation (a/k/a revenue sharing), but did not disclose the amount or formula.

47. For the 403(b) Plan, Defendants' compensation arrangement with Lincoln from 2009 to 2011 was based entirely on Lincoln's receipt of revenue sharing payments from the 403(b) Plan's investments.  Plaintiffs do not know the amount received by Lincoln, because Essentia did not disclose the amount or formula, nor can the amount be

---

[3] Prior to the consolidation of the Plans' operations in 2012, the Retirement Plan used a July 1 to June 30 plan year, versus the calendar year used by the 403(b) Plan (and by both Plans today).  The Retirement Plan's 2009 plan year ran from July 1, 2009 to June 30, 2010.

discerned from the Plan's investments, given that the 403(b) Plan's 5500s during this period did not disclose the share class of its mutual fund investments.

48. Based on Defendants' disregard for BMO Harris' excessive compensation (and Defendants' other failures described herein), it is reasonable to infer the revenue sharing payments collected and retained by Lincoln exceeded the reasonable value of Lincoln's recordkeeping services.

49. The problem worsened in the 2010 plan year.[4]  Defendants permitted BMO Harris to collect $142 per participant in direct compensation, in addition to the revenue sharing BMO Harris was receiving.  The amount of revenue sharing received by BMO Harris in 2010 is unknown, because Essentia again reported extra indirect compensation to BMO Harris on its Form 5500 but not the amount or formula.  The 403(b) Plan's payments to Lincoln also remained a black box.  Essentia disclosed only that Lincoln's compensation was paid almost entirely through revenue sharing, which Essentia refused to quantify. Reasonable recordkeeping services remained available, for plans the same size as the Plans, for between $60 and $80 per participant—and trending downward.  Despite the grossly excessive 2009 compensation and a competitive market, Defendants failed to make any changes in the 2010 plan year to bring the Plans' recordkeeping costs under control.   Instead, Defendants continued to fail to monitor the Plans' expenses or investigate available alternatives, permitting the Plans' losses to compound.

---

[4] For the Retirement Plan, the 2010 plan year ran from July 1, 2010 to June 30, 2011.  For the 403(b) Plan, the 2010 plan year ran from January 1, 2010 to December 31, 2010.

50. The unfortunate trend continued into the 2011 plan year.  Between July 1, 2011 and December 31, 2011, BMO Harris' compensation from the Retirement Plan, as an annualized figure, grew to $146 per participant.  Defendants belatedly made a change at the end of 2011, but not until the Plans had already paid millions of dollars in excess fees pursuant to the imprudent relationships BMO Harris and Lincoln.

51. Effective January 1, 2012, the Retirement Plan and 403(b) Plan belatedly combined for administrative and other purposes.  The Retirement Plan was broadened as of January 1, 2012 to cover additional employees, and by year end had over 14,000 participants.  The 403(b) Plan had approximately 3,200 participants by the end of 2012.

52. The Plans each changed recordkeepers in 2012 to Diversified Retirement Corporation ("Diversified").  One example of the administrative consolidation was that Participants with balances in both Plans received only one statement.   Defendants also decided on a single investment lineup for the Plans, and have maintained the Plans' investment lineups together.

53. Defendants' change to Diversified, although a small, short-term improvement, was the result of a truncated, inadequate fiduciary process.  Since 2012, weaknesses in the relationship have been exploited to extract ever-increasing recordkeeping fees from the Plans.  Though Defendants and Diversified have consistently represented to participants in their 404a-5 disclosures that the base recordkeeping fee was set at between $52 and $53 per participant, these disclosures further provide that the recordkeeper will collect

additional fees directly from participants' investments, in varying amounts, as the recordkeeper sees fit.

54. The base fee negotiated by Defendants, on its own, was at the high end of the reasonable range for 2012. Based on Plaintiffs' investigation and analysis of the market, for a plan the size of the combined Plans (the Plans had over 17,000 participants by the end of 2012, due primarily to additional Essentia Health subsidiaries being added to the Retirement Plan effective January 1, 2012), reasonable recordkeeping services were available for an all-in fee of between $45 and $55 per participant.

55. In investigating the market, selecting a new vendor, and negotiating the terms, a prudent fiduciary would not have allowed the new recordkeeper open-ended access to extra fees on top of this high base fee. At minimum, a prudent fiduciary would have closely monitored the recordkeeper's performance of the agreement and prevented the recordkeeper from collecting unreasonable discretionary fees.

56. Defendants' conduct fell far short of this standard. In 2012, from the Plans combined, Diversified collected $65 per participant in direct compensation. Though the change in vendors and pricing terms had the potential to bring the Plans' recordkeeping expenses down to earth, Diversified's extraction of extra compensation beyond the $53 per account fee took the Plans' recordkeeping expenses from the high end of the reasonable range to well above the reasonable range.

57. Despite Diversified's abuse of its access to participants' accounts to draw excess fees from the Plans in 2012, Defendants did not take any action in 2013 to limit recordkeeping

fees to a reasonable amount.  Instead, Defendants' dereliction of their fiduciary duties continued.  For the 2013 plan year, Diversified was merged by its parent company with affiliate Transamerica Retirement Solutions ("Transamerica") and rebranded under the Transamerica name.  This change in recordkeeper, together with the abuses in 2012, should have put Defendants on notice by the beginning of 2013 that the Plans' recordkeeping expenses needed to be monitored closely. Instead, Defendants stood by idly as Transamerica took advantage of the Plans to collect $89 per participant in direct compensation.  By permitting Transamerica unchecked access to participants' accounts, the Plans' recordkeeping expenses ballooned to twice the amount the Plans would have paid had they prudently investigated and monitored the Plans' recordkeeping expenses.

58. In 2014, the market for recordkeeping services to retirement plans continued its trend toward lower fees.  Furthermore, the combined size of the Plans had increased by almost 3,000 participants, increasing the Plans' bargaining power.  In the 2014 to 2016 time frame, a plan the size of the Plans (19,684 participants with account balances and over $1 billion in combined assets by the end of 2014, and 19,783 participants with account balances and almost $1.1 billion in assets by the end of 2015) could have obtained recordkeeping services for an all-in fee of between $35 and $45 per participant. Notwithstanding, Defendants continued to allow Transamerica to deduct variable, discretionary compensation from participants' accounts without limitation. Transamerica increased its direct compensation from the Plans to $94 per participant in 2014, more than twice a reasonable fee.  Transamerica deducted excessive discretionary

compensation from participants' account again in 2015, totaling $88 per participant. The Plans therefore paid approximately $1 million in excess recordkeeping fees in 2014, and again in 2015.

59. From 2010 through 2015, Defendants have consistently disregarded their fiduciary obligations to monitor and control the Plans' recordkeeping expenses, resulting in millions of dollar in losses to the Plans.

60. Transamerica has continued to serve as the Plans' recordkeeper throughout 2016. Plaintiffs with account balances in 2016 continue to see discretionary, variable compensation deducted from their accounts. Although the Plans have not disclosed Transamerica's total compensation for 2016, because neither the recordkeeper nor the charges to participants' accounts have changed, Defendants presumably have caused excess recordkeeping fees to be paid in 2016 as well.

### Plaintiffs Lacked Knowledge of Defendants' Conduct and Prudent Alternatives

61. Plaintiffs did not have knowledge of all material facts (including, among other things, the total compensation received by the Plans' recordkeepers and the excessiveness of the Plans' recordkeeping costs compared to alternative service providers) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed. Plaintiffs did not receive or review the Forms 5500 referred to in the Complaint until 2015 or 2016. Plaintiffs do not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plans (including Defendants' processes and motivations for

selecting, monitoring, evaluating, and removing the Plans investments, the information obtained by Defendants and the information available to them, and Defendants' processes for selecting and monitoring the Plans' recordkeeper), because this information is solely within the possession of Defendants prior to discovery.  For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## **CLASS ALLEGATIONS**

62. Section 1132(a)(2) of ERISA authorizes any participant or beneficiary of the Plans to bring an action individually on behalf of the Plans to recover for the Plans the remedies provided by 29 U.S.C. § 1109(a).  Plaintiffs seek certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

63. Plaintiffs assert their claims against Defendants on behalf of a class of participants and beneficiaries of the Plans defined as follows:[5]

> All participants and beneficiaries of the Retirement Plan or the 403(b) Plan at any time on or after December 21, 2010, excluding Defendants, any of their directors, and any officers or employees of Defendants with responsibility for the Plans' investment or administrative functions.

64. <u>Numerosity</u>: The Class is so numerous that joinder of all Class members is impracticable. The Plans have approximately 20,000 participants with account balances.  Individual treatment of all claims is impracticable.

---

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

65. <u>Typicality</u>:  Plaintiffs' claims are typical of the Class members' claims.  Like other Class members, Plaintiffs participated in the Plans and have suffered injuries as a result of the above-referenced mismanagement of the Plans.  Defendants treated Plaintiffs consistently with other Class members with regard to the Plans.

66. <u>Adequacy</u>:  Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation.  Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

67. <u>Commonality</u>:  Common questions of law and fact exist as to all Class members, and predominate over any questions solely affecting individual Class members, including but not limited to:

   a. Whether Essentia, SMDC, the Investment Committee, Davidson, and John Does 1–30 are fiduciaries of the Plans;

   b. Whether the Plans' fiduciaries breached their fiduciary duties by engaging in the conduct described herein;

   c. Whether the Plans' fiduciaries are additionally or alternatively liable, as co-fiduciaries, for the unlawful conduct described herein pursuant to 29 U.S.C. § 1105;

   d. Whether Essentia and SMDC breached their duty to monitor other fiduciaries to ensure the Plans were being managed in compliance with ERISA; and

   e. The proper measure of monetary relief.

68. Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

69. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plans that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other of the Plans' participants.

70. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims being brought against Defendants by any Class members on an individual basis.

Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

**COUNT I**
**Breach of Duties of Loyalty and Prudence**
**29 U.S.C. § 1104(a)(1)(A)–(B)**

71. Essentia, the Investment Committee, Davidson, and John Does 1–30 are fiduciaries of the Plans under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

72. Section 1104 of ERISA imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plans, their selection and monitoring of the Plans' service providers, and in their monitoring of the Plans' recordkeeping expenses.

73. The scope of the fiduciary duties and responsibilities of the Defendants includes managing the assets of the Plans for the sole and exclusive benefit of the Plans' participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, diligence, and prudence required by ERISA. Further, Defendants were directly responsible for ensuring that the Plans' expenses were reasonable and for surveying the marketplace to make sure the Plans were not paying unnecessary expenses. *See Tussey*, 746 F.3d at 336 (affirming liability finding where fiduciaries failed to "monitor Plan recordkeeping costs" and "determine whether [the recordkeeper's] pricing was competitive").

74. As described throughout the Complaint, Defendants failed to prudently investigate and select a reasonable recordkeeping arrangement. Defendants also failed to monitor the performance of the Plans' recordkeepers, and control recordkeeping fees taken from the Plans' participants. As a result of these failures, participants in the Plans have paid millions of dollars in excessive recordkeeping fees.

75. Each of the above-mentioned imprudent actions and omissions illustrate Defendants' failures to monitor the Plans and make decisions based solely on the merits of each action and the best interest of the Plans and their participants.  Defendants were derelict in their duties and caused the Plans to pay excessive compensation to service providers. Defendants permitted the Plans' service providers to double down on fees to ensure the Plans paid all fees and none were borne by Essentia, acting with an eye to Defendants' own interests and putting the best interest of Plans second.  Through these actions and omissions, Defendants failed to discharge their duties with respect to the Plans solely in the interest of the participants and beneficiaries of the Plans, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

76. Through the actions and omissions described in paragraph 74 and throughout this Complaint, Defendants also failed to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used

in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

77. Each of the Defendants is personally liable, and all are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3), to make good to the Plans the losses resulting from the aforementioned breaches, to restore to the Plans any profits the Defendants made through the use of the Plans' assets, and to restore to the Plans any profits resulting from the breaches of fiduciary duties alleged in this Count.

78. Defendants knowingly participated in each fiduciary breach of the other Defendants, knowing that such acts were a breach, and enabled the other Defendants to commit fiduciary breaches by failing to lawfully discharge their own duties.  The Defendants knew of the fiduciary breaches of the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT II
### Failure to Monitor Fiduciaries

79. As alleged throughout the Complaint, Essentia and SMDC are fiduciaries of the Plans.

80. Essentia had overall oversight responsibility for the Plans and control over the Plans' investment options and service providers through its authority to appoint and remove Investment Committee members and individual administrators.   Essentia therefore had

a fiduciary responsibility to monitor the performance of the fiduciaries operating under its control.

81. Prior to 2012, SMDC had overall oversight responsibility for the Retirement Plan and control over the Retirement Plan's investment options and service providers through its authority to appoint and remove individual administrators.  SMDC therefore had a fiduciary responsibility to monitor the performance of the fiduciaries operating under its control.

82. Pursuant to its overall oversight responsibility and control of the Plans, Essentia and SMDC were responsible for establishing and administering rules and procedures with respect to all matters arising under the Plans, including the conduct of the Investment Committee and Davidson in investigating, selecting, overseeing, and retaining service providers.  Essentia was further responsible for monitoring the performance of all Essentia employees who performed functions for the Plans.  SMDC was similarly responsible for SMDC employees who performed functions for the Retirement Plan prior to 2012.

83. A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to monitoring of plan assets and expenses, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA.

84. To the extent Essentia or SMDC delegated fiduciary monitoring responsibilities to John Does 1–30 or other Defendants named herein, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were performed prudently and loyally.

85. Essentia and SMDC breached its fiduciary monitoring duties by, among other things:

   a.  failing to monitor and evaluate the performance of the Investment Committee or Davidson or have a system in place for doing so, standing idly by as the Plans suffered losses as a result of other Defendants' imprudent recordkeeping arrangements;

   b.  failing to monitor the processes by which the Plans' recordkeeping arrangements were investigated, approved, and monitored, which would have alerted a prudent fiduciary to the Plans' lopsided deals (weighing strongly against the Plans); and

   c.  failing to remove fiduciaries whose performance was inadequate in that they continued to permit the Plans to suffer losses through unchecked recordkeeping fees.

86. As a consequence of the foregoing breaches of the duty to monitor, the Plans suffered millions of dollars in losses due to excessive fees and loss of value and investment opportunity.

87. Pursuant to 29 U.S.C. § 1109(a), 1132(a)(2), and 1132(a)(3), Essentia and SMDC are liable to restore to the Plans all losses suffered as a result of the fiduciary breaches that resulted from their failure to properly monitor the Plans' fiduciaries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

- Find and declare that Defendants breached their fiduciary duties as described above;

- Find and adjudge that Defendants are liable to make good to the Plans all losses that the Plans incurred as a result of the conduct described above and to restore the Plans to the position they would have been in but for the breaches of fiduciary duty;

- Award actual monetary losses to the Plans;

- Order equitable restitution and other appropriate equitable monetary relief against Defendants;

- Order the permanent removal of Defendants from any positions of trust with respect to the Plans;

- Order Defendants to render an accounting;

- Surcharge Defendants, in favor of the Plans, for all amounts involved in transactions that such accounting reveals were or are improper, excessive and/or in violation of ERISA;

- Enjoin Defendants from any further violations of its ERISA fiduciary responsibilities, obligations, and duties;

- Order the appointment of an independent fiduciary to administer the Plans for a certain number of years;

- Order the Plans to engage in a competitive bidding process, overseen by the independent fiduciary, for recordkeeping services to the Plans;

- Order that this action be certified as a class action and that the Class be designated to receive the amounts restored or disgorged to the Plans by Defendants and a constructive trust be established for distribution to the extent required by law;

- Award Plaintiffs and their attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the Common Fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Award such other and further relief as the Court deems equitable and just.

Dated:  December 29, 2016                **MADIA LAW LLC**

                                        s/ J. Ashwin Madia
                                        J. Ashwin Madia, #321187
                                        Joshua Newville, #395221
                                        Cody Blades, #396341
                                        345 Union Plaza
                                        333 Washington Avenue North
                                        Minneapolis, MN  55401
                                        Phone:  612.349.2723
                                        Fax:  612.235.3357
                                        jamadia@madialaw.com

                                        **NICHOLS KASTER PLLP**

                                        Kai H. Richter, MN Bar No. 0296545
                                        Carl F. Engstrom, MN Bar No. 0396298
                                        Brandon T. McDonough, MN Bar No. 393259
                                        4600 IDS Center
                                        80 S 8th Street
                                        Minneapolis, MN 55402
                                        Telephone: 612-256-3200
                                        Facsimile: 612-338-4878
                                        krichter@nka.com

cengstrom@nka.com
bmcdonough@nka.com

**ATTORNEYS FOR PLAINTIFF**